IRVIN A. BROADNAX, ADMINISTRATOR OF THE ESTATE OF FLOYD BOONE, DECEASED v. ROBERT LEE DELOATCH

No. 706SC307

(Filed 15 July 1970)

**1. Automobiles § 44— res ipsa loquitur — sufficiency of evidence**

Plaintiff administrator's evidence was sufficient to make out a *prima facie* case of defendant's negligence in the accident resulting in the intestate's death, the doctrine of *res ipsa loquitur* being applicable, where the evidence would support a finding that the defendant, while driving on a clear night upon a 21-foot wide highway which was dry and free from defects, and without interference from any other traffic, drove his car off of the pavement and into the rear of the car occupied by plaintiff's intestate while that car was parked on the dirt shoulder of the road entirely off the pavement and with its lights burning.

**2. Negligence § 29— sufficiency of evidence of negligence**

Where plaintiff's evidence was sufficient to support a finding that defendant was negligent in at least one of the respects alleged in the complaint and that such negligence was a proximate cause of the injuries and death of the deceased, the evidence was sufficient to withstand defendant's motion for nonsuit.

APPEAL by plaintiff from *Peel, J.,* November 1969 Session of NORTHAMPTON Superior Court.

This is a civil action in which plaintiff seeks to recover damages for the wrongful death of his intestate which plaintiff alleged was proximately caused by defendant's negligence. In his complaint plaintiff in substance alleged: Plaintiff is administrator of the estate of Floyd Boone, deceased. On the night of 9 July 1966, Boone drove his automobile in a westerly direction on N.C. Highway 195. At a point about one mile east of Seaboard, N. C., he drove his car to the right shoulder of the road and came to a stop with all wheels of his automobile off of the paved portion of the highway and with all lights on the car burning. While Boone's car was so parked, defendant Deloatch, driving his car also in a westerly direction along the same highway, drove off of the paved portion of the highway and onto the shoulder of the road, colliding with the rear of Boone's parked automobile. The collision threw Boone from his car and caused the injuries which resulted in his death a few hours later.

Plaintiff alleged the collision and Boone's death were proximately caused by defendant's negligence (1) in driving his car in a careless and reckless manner in violation of G.S. 20-140, (2) in driving while under the influence of alcohol, (3) in driving in excess of the posted speed limit, and (4) in carelessly and negligently driving his vehicle off of the travel lane of the highway and onto the dirt

shoulder and into the rear of Boone's parked automobile in violation of G.S. 20-146.

Defendant answered, denying the material allegations of the complaint and pleading as a further answer and defense that Boone had operated his vehicle upon the public highways while in an intoxicated condition and that this constituted contributory negligence.

Plaintiff offered evidence to establish the death of his intestate on 10 July 1966 as a result of severe cerebral concussion, the appointment of plaintiff as administrator of his estate, and the age, good health, and earning capacity of the deceased immediately prior to the collision. Relative to the circumstances of the collision, plaintiff presented witnesses who testified in substance (except where quoted) as follows:

The investigating highway patrolman testified: The highway where the collision occurred ran in a generally east-west direction, was straight and level, was paved with smooth asphalt for a width of 21 feet, was marked with a center line in the middle and a solid white line on each side. The highway was free from defects, and had a shoulder eight feet wide. The weather was clear, and the road dry. The patrolman was called to the scene about 11:15 p.m. on 9 July. He found defendant's 1961 Ford automobile in the center of the highway headed west. It was extensively damaged on the right front and the radiator was broken. A 1959 Chevrolet was sitting almost perpendicular to the highway in a road ditch off of the highway on the north side near a farm path. The entire rear of the Chevrolet was extensively damaged. Marks on the highway led back from the wheels of defendant's Ford toward the farm path. Broken glass and debris were on the north lane and on the north edge of the highway 116 feet distant from the front of defendant's Ford. Twelve feet of scuff marks led from the edge of the highway to the rear of the Chevrolet. Defendant was at the scene and told the patrolman that he was the driver of the Ford, that he was headed in a westerly direction and "started to pass a vehicle and was meeting oncoming traffic and had to pull abruptly back in his right lane and when he did he hit the rear of this vehicle here near the shoulder or on the shoulder."

Pearlean Jordan testified: She knew both the defendant and the deceased. On the night of 9 July 1966 she was driving in a westerly direction toward Seaboard. As she came to the Sante Fe Inn, she slowed to permit defendant's car to pull out ahead of her. "He was coming out so reckless like." She followed defendant's car and there were no other cars on the road, no car passed her, and she met no

other car. Defendant's car hit something, "and the lights went up." She drove up and stopped, and defendant came to her car and told her "he had hit Floyd Boone." She walked up and found Boone lying on the ground beside a path which led to his home, with his head to the edge of the highway. Blood was running out of his mouth. She knew Boone's car, which Boone had just gotten that afternoon. Boone's car was "in the farm path and headed or turned and knocked back to the way we were coming. I know that from the lights, the lights went up like that and I know."

Daniel Boone, a son of decedent, testified: The Santa Fe Inn is approximately a mile and a half from his home. He was with his father at the Sante Fe Inn about 10:30 or 11:00 p.m. on 9 July 1966. His father left the Inn, driving west from the Inn to go home. About five minutes later Daniel left the Inn and went to the scene of the accident about one mile and a quarter from the Sante Fe Inn. When he got there, his father's car was in the ditch with the lights on, "turned in the opposite direction headed back east in the field." Defendant's car was down the road approximately 60 feet and in the center of the highway. He observed this about six or seven minutes from the time he saw his father at the Sante Fe Inn. His father was lying on his back in the farm path with a bad cut on his throat and appeared to be unconscious.

Paul Boone, another son of decedent, testified: On the night of the accident he was at the Sante Fe Inn and saw his father and brother there. He also saw the defendant at the Inn. He saw defendant drink a beer but did not see his father drink any. He saw both his father and the defendant when they left. Defendant left about five minutes or more after his father left. Defendant left "with tires squalling when he pulled out of the driveway." The witness next saw defendant's car five or six minutes later. It was in the center of the highway and the right front fender was damaged. His father was lying in the path behind his car, which was turned around in an easterly direction headed back in the field. The left-hand rear fender on his father's car was bent. "The lights were still on and the doors jammed. There was not a glass cracked on it. None of the doors were open." His father was taken to the hospital that night and died the next morning.

Glenn Williams testified: He saw Floyd Boone on the afternoon of 9 July 1966 right after Boone got his new car. At that time Boone came by the shop where Williams and Boone's son were working and showed Williams his new car. Williams next met Boone about 9:30 that night when Boone came in the door at the Sante Fe Inn as

Williams was leaving. Later, about 10:00 or 10:30, Williams, with a passenger, Jesse Pierce, was driving on Highway 195 traveling east going toward the Sante Fe Inn when he saw the Boone car. "At that time I saw the Boone car pull off to the shoulder of the highway. I pulled up . . . The Boone car pulled off the shoulder of the road and stopped. The lights of the car were on." The Boone car was in the area where the path goes to the Boone home. Williams slowed down and went to another driveway and turned in. "[T]he Boone car was still parked on the shoulder of the road, the side of the road. It was off the pavement. . . . I drove in the path to turn around to go back to where Floyd's car was parked . . . but before I could turn around, my car got hung up in the gears and Jesse Pierce got out to work the gear lever to get it unstuck, and that time or about that time, the Deloatch car came along and ran into the back of the Floyd car and another car came along, and I had to sit there in the driveway and wait until those cars passed. While I was sitting in the driveway, the Deloatch car passed me at the pathway. It went on toward Seaboard. Mr. Floyd's car was sitting on the shoulder of the road. Deloatch hit him from behind and turned it around back toward the Sante Fe Inn. Deloatch's car stopped in the middle of the road after he hit him. I backed out the driveway and pulled off the road behind this car. Deloatch got out of the car. After the Deloatch car passed me, it hit Floyd's car. It was still on the road, it was on the right. I was sitting in the path and the Deloatch car passed me 'This way.' (pointing) And at the time the Floyd Boone car was sitting over here. I mean off of the road. . . . The Deloatch car came on down to the shoulder of the road. When I say shoulder of the road, I mean the dirt part. . . . At the time I turned into the path, I saw Mr. Floyd turn on the shoulder of the road. I saw him turn the car off the road and the next time I saw him he was lying in the path. Before the accident, he pulled off of the highway onto the shoulder and after the accident, he was in the driveway. . . . He was just lying in the driveway."

On cross-examination Williams admitted it was dark and he could not see who was driving the Boone car, but testified he knew the car which Boone had just bought that afternoon. "I didn't know if it was Mr. Floyd Boone or 'Dan' driving the car. I know that the car pulled over on the shoulder and I was going back up there to see what was wrong."

Jesse Pierce testified: He was a passenger in the Williams car. "When I first saw the Floyd Boone car it was going in the gate

where they go home. The car was moving, it was going off the road into his gate." The Williams car slowed down and went "to the other gate and pulled in there and the gear got hung. I got out to unhang them and two cars were coming up the road and I got the gears unhung and set the hood down and I saw the lights flash on. . . . When I said the lights flashed, that was Mr. Boone's car. I did not notice Mr. Boone's car before his lights flashed. It had lights on and I heard a BAM-A-LAM and I saw the lights flash around. At the time of the sound, the Boone car turned around. Just before the sound, it was sitting in the gate off the road in the path. The Boone car pulled off the road before the gears got hung. We were going back there. At the time I was putting the hood down, the Boone car was still there where it had stopped."

At the conclusion of plaintiff's evidence defendant's motion for nonsuit was allowed and plaintiff appealed.

*James R. Walker, Jr., for plaintiff appellant.*

*Charlie D. Clark, Jr., for defendant appellee.*

PARKER, J.

[1, 2] This case should have been submitted to the jury. From plaintiff's evidence the jury could legitimately have found that defendant, while driving on a clear night upon a 21-foot wide dry paved highway which was free from defects, and without any interference from other traffic, drove his car off of the pavement into the rear of the car occupied by plaintiff's intestate while that car was parked on the dirt shoulder of the road entirely off of the pavement and with its lights burning. "When a motor vehicle leaves the highway for no apparent cause, it is not for the court to imagine possible explanations. *Prima facie*, it may accept the normal and probable one of driver-negligence and leave it to the jury to determine the true cause after considering all the evidence — that of defendant as well as plaintiff." *Greene v. Nichols*, 274 N.C. 18, 161 S.E. 2d 521. Plaintiff's evidence was sufficient, therefore, to support a finding that defendant was negligent in at least one of the respects alleged in the complaint and that such negligence was a proximate cause of the injuries and death of the deceased. That was all plaintiff was required to show in order to withstand the motion for nonsuit. *Funeral Home v. Pride*, 261 N.C. 723, 136 S.E. 2d 120.

Appellee contends nonsuit was warranted because of a material variance between plaintiff's allegations and proof. In his brief appellee states that plaintiff's witness Williams testified he "had seen

Floyd Boone get out of his car and he was on the shoulder of the road just when Robert Deloatch passed and ran into the back of his car." Appellee contends this constituted a material variance from the allegation in plaintiff's complaint that Boone was thrown from the car. We question whether such a variance, had it existed, should be considered material. However, we do not find it necessary to decide that question, since in the record before us we find no such testimony as is recited in appellee's brief from the witness Williams or from any other witness. There was testimony that following the collision the doors on Boone's car were found jammed shut and his body was found lying on the ground outside the car. However, there was also testimony that the collision was of such force as to turn Boone's car completely around. In the process a door could have been sprung open, Boone ejected, and then the door slammed shut. In any event, on the record before us, whether Boone got out of his car before the collision or whether, as alleged in the complaint, he was thrown out as a result of the collision, were matters for the jury to determine.

The judgment of nonsuit is

Reversed.

CAMPBELL and VAUGHN, JJ., concur.